UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Western Division

FILED
IN CLERKS OFFICE

2019 JAN -7  PM 1: 26

U.S. DISTRICT COURT
DISTRICT OF MASS.

**MICHAEL HOOTSTEIN**
    Plaintiff

v.

**AMHERST-PELHAM REGIONAL**
**SCHOOL COMMITTEE**
    Defendant

)
)
)
)
) C.A. NO.: 3:17-cv-30146-KAR
) **JURY DEMAND**
)
)
)

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR EMERGENCY PRELIMINARY INJUNCTION TO PREVENT IRREPARABLE HARM TO AMHERST, MA SCHOOLCHILDREN

**"First, one must make every attempt to resolve problems within the system, before taking distasteful allegations public. Second, a whistleblower must also believe that true harm (e.g., public endangerment or a miscarriage of justice) could result from remaining silent." (Flintwaterstudy.org, December 28, 2018)**

## I. INTRODUCTION

**Based on new case evidence provided herein,** the Pro Se Plaintiff **"whistle blower"**, Michael Hootstein, custodial grandfather of an Amherst High School Senior and Principal Hydrogeologist, Legacy Environmental Group, seeks an emergency preliminary injunction against the Defendant Amherst-Pelham Regional School Committee, to prevent foreseeable, imminent and irreparable lead-poisoning injury to his Grandson, the Plaintiff, more than 2,500 other Amherst schoolchildren and their parents. He respectfully asks for an Order compelling

1

the Committee to provide all Amherst students and their parents equal access to the same safe bottled water - not exceeding the U.S. Food & Drug Administration ("FDA") 5 parts per billion ("ppb") lead limit - which the Committee provides to the Superintendent and his "Central Office" administrators whose offices are located in Amherst Regional Middle School.

**Defendant Amherst admits Amherst Regional Middle School drinking water is unfit for human consumption** as evidenced by Amherst's decision to purchase bottled water (not exceeding the FDA 5 ppb lead limit) for the Superintendent and his staff, but not for Amherst Regional Middle School students or for any of the other 2,500 Amherst schoolchildren (like Plaintiff's Grandson) who are exposed to toxic high levels of lead in Amherst schools each and every school day. **(*See* Exhibit A, pp. 156 -159 "Central Office Water").**

Mr. Hootstein respectfully requests that the Court grant his Motion for Emergency Preliminary Injunction for the reasons explained in this memorandum **based on newly gleaned case evidence Exhibit A above and Exhibit B** - a preliminary study, analysis and design of cost-effective solutions, titled *"Lead In Amherst, MA School Drinking Water - Cost Effective Solutions Exist"*, by Michael Hootstein (Hydrogeologist, Legacy Environmental Group), Glen Ayers (retired County Health Agent, Registered Sanitarian and Certified Public Water Supply Operator) and Professor Marc Edwards.

Irrefutable scientific evidence proves students attending Amherst Regional Middle School (and other Amherst schools) are exposed to toxic high levels of lead in school each and every school day. For example:

In Amherst Regional Middle School - **29 of 40** tests exceeded the 5 ppb FDA lead limit, and **21 of 40** exceeded the outdated 15 ppb action level. Dangerous levels of lead were found in the Middle School Boys' Locker Room Bubbler - **250 ppb**, Family Center - **120 ppb**, Health Room - **60 ppb**, Girl's locker room bubbler - **83 ppb** and bubblers - **220, 110 and 100 ppb.** **(*See* Exhibit B, p. 2, ¶ 8)**

2

## II. STATEMENT OF FACTS SET FORTH IN EXHIBIT B
## BY MICHAEL HOOTSTEIN, GLEN AYERS & DR. MARC EDWARDS

*It is important to reduce lead exposures as much as possible - particularly for young children, pregnant women, and infants - because "there is no safe level of lead exposure." (Emphasis added) - Massachusetts Department of Public Health* [1]
Comprehensive, state-directed testing[2] in 2016 for lead in Amherst school drinking water revealed very serious health concerns at Fort River, Wildwood and Crocker Farm Elementary Schools, Amherst Regional Middle and High Schools, and Southeast Campus School - water from many taps was found to be unfit for human consumption and poses an unnecessary health risk to children. This is especially troubling because lead adversely affects virtually every organ system and young children are especially susceptible to health harm.

In the least lead-contaminated Amherst schools (the High School and Crocker Farm Elementary), 31-35% of each school's drinking water tests exceeded the 5 parts per billion (ppb) U.S. Food & Drug Administration (FDA) lead limit for bottled water[3] and 9-13% exceeded the Environmental Protection Agency (EPA) 15 ppb lead action level for Public Water Supplies.  This outdated 15 ppb action standard[4] is 15 times higher than the 1 ppb maximum safe lead recommendation for children put forth by the American Academy of Pediatrics[5]. The highest level of lead (**460 ppb**) was found in the High School Health Room.

In Southeast Campus - **6 of 6** tests exceeded the 5 ppb FDA lead limit, and **4 of 6** exceeded the outdated EPA 15 ppb action level.  We commend the Superintendent for purchasing bottled water (less than 5 ppb lead) for Southeast Campus students during the 2017-2018 school year.

In Amherst Regional Middle School - **29 of 40** tests exceeded the 5 ppb FDA lead limit, and **21 of 40** exceeded the outdated 15 ppb action level.  Dangerous levels of lead were found in the Middle School Boys' Locker Room Bubbler - **250 ppb**, Family Center - **120 ppb**, Health Room - **60 ppb**, Girl's locker room bubbler - **83 ppb** and bubblers - **220, 110 and 100 ppb**.

---

[1] MA DPH "lead-drinking-water-faq.pdf" available at
https://www.mass.gov/doc/lead-in-drinking-water-faqa-english-0/download
[2] MA Executive Office of Energy & Environmental Affairs, Data Portal, "Search for Lead and Copper Drinking Water Results in Schools/Childcare" available at
https://eeaonline.eea.state.ma.us/portal#!/search/leadandcopper
[3] US FDA "Bottled Water Everywhere: Keeping it Safe" available at
https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm203620.htm
[4] US Environmental Protection Agency "15 ppb Action Level" not a health-based standard, see page 36 of US Government Accountability Office report "Lead Testing of School Drinking Water Would Benefit From Improved Federal Guidance" available at
https://www.gao.gov/products/GAO-18-382
[5] American Academy of Pediatrics, AAP Council on Environmental Health, "Prevention of Childhood Lead Toxicity" available at
https://pediatrics.aappublications.org/content/138/1/e20161493.full-text.pdf

In Wildwood Elementary School - **66 of 75** tests exceeded the 5 ppb FDA lead limit, and **40 of 75** exceeded the 15 ppb action level. Dangerous levels of lead were found in the ELL Room - **67**, Food Prep - **22, 23 and 18 ppb** and bubblers - **53, 50, 44 ppb.**

After obtaining these results the Superintendent correctly noted the "Fort River, Wildwood and the Middle School were built within four years of one another (from 1969 - 1973) so it is likely that the same intervention work will be required at all three since their systems are similar. We wanted to identify the best repair method… so our maintenance staff began work first at Fort River."

The progress at Fort River revealed the difficulties and expense of piecemeal remediation. In the initial round of sampling **77 of 78** of the 2016 tests exceeded the 5 ppb FDA lead limit for bottled water and **63 of 78** exceeded the 15 ppb action level. Dangerous levels of lead were found in Room CR-1 - **210 ppb** and bubblers - **66, 60, 57 ppb!**

**After the Fort River maintenance staff repaired 20 of 63 bubblers, the retest on September 30, 2016 revealed 20 of 20** tests still exceeded the 5 ppb FDA lead limit and **16** exceeded the 15 ppb action level.

After still further repairs on the 16 taps still exceeding the action level, another retest on November 11, 2016 found **12 of 16** tests exceeded the 5 ppb FDA lead limit, and **6 of 16** still exceeded the 15 ppb action level.

After even more targeted repairs were undertaken on 50 more taps, testing on 1/12/2017 revealed that **23 of 50** tests exceeded the 5 ppb FDA lead limit, and **7 of 50 still** exceeded the outdated 15 ppb action level. There was still **650 ppb lead** in tap water of the school Health Room.  In other words, despite all the effort and expense, the data still indicates that some of the school water at Fort River remained unfit for human consumption.

Despite these discouraging results, we should not accept defeat, because cost effective alternative strategies still exist. For a total cost of $8,000-10,000, 4-5 lead filtered hydration stations could be installed in each school, where students could fill water bottles and obtain lead free water with complete confidence. This sort of simple investment would not only provide parents with peace of mind. Reducing our children's lead exposure would also pay important possible future dividends in the form of increased IQ scores, improved lifetime earning expectancy, and reduced rates of incarceration and other social ills.

Amherst can extend its 2016 success in testing for and identifying its schools' water lead problems, and its hard-earned experiences with the difficulties of remediating taps, by implementing an affordable and effective "Get the Lead Out" solution that meets modern American Academy of Pediatrics standards.

## III. LEGAL STANDARD

In considering whether to grant a preliminary injunction, district courts in this Circuit

look to: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to

what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance

of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the

withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9

(1st Cir. 2013); W. Holding Co., Inc. v. AIG Ins. Co.-Puerto Rico, 748 F.3d 377, 383 (1st Cir.

2014) ("Whether a mandatory preliminary injunction should issue typically depends on the

exigencies of the situation, taking into account [the] four familiar factors . . . .").

> "The purpose of a preliminary injunction is always to prevent irreparable injury so as to
> preserve the court's ability to render a meaningful decision on the merits. It often happens
> that this purpose is furthered by preservation of the status quo, but not always. If the
> currently existing status quo itself is causing one of the parties irreparable injury, it is
> necessary to alter the situation so as to prevent the injury, either by returning to the last
> uncontested status quo between the parties, Ross-Whitney Corp. v. Smith Kline & French
> Laboratories, 9 Cir. 1953, 207 F.2d 190, by the issuance of a mandatory injunction, see 7
> Moore's Federal Practice P65.04(1), or by allowing the parties to take proposed action that
> the court finds will minimize the irreparable injury. The focus always must be on prevention
> of injury by a proper order, not merely on preservation of the status quo." (Canal Auth. of
> State of Fla. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974))

## IV. ARGUMENT

### A. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

Plaintiff's Complaint is likely to succeed on the merits of his claims for declaratory and

injunctive relief under *42 U.S.C. § 1983*, that Defendant Amherst Regional School Committee

has violated, and continues to violate, the Plaintiff Custodial Grandfather's and Grandson's

procedural and substantive **due process liberty right to bodily integrity under the 14th**

**Amendment to the U.S. Constitution**.

Plaintiff's **Complaint Facts (see Complaint) and newly gleaned Exhibits A - C Facts**

prove Defendant School Committee's malfeasant conduct and misleading parents, teachers and

5

students alike (falsely ensuring them school water is safe when it is not), dangerously exposing

over 2,500 vulnerable Amherst schoolchildren (like Plaintiff's Grandson), siblings, parents (like

the Plaintiff), teachers and members of the public who utilize Amherst Public Schools, to high

toxic concentrations of lead in school drinking water. (**Compl. ¶¶ 1, 4-5, 23-30, 32-37**).

According to a National Center for Health Housing ("NCHH") Issue Brief: ***Childhood***

***Lead Exposure and Educational Outcomes Costs***, societal costs resulting from childhood lead-

poisoning and related emotional and financial costs to parents (like the Plaintiff in the instant

matter) of children with learning disabilities is exorbitant (**Compl. ¶ 22**)

> Childhood lead exposure, even at low levels, remains a critical public health issue... It
> is also a costly disease, with recent estimates putting its **price tag at over \$50 billion in
> a single year due to lost economic productivity resulting from reduced cognitive
> potential**... Once a child's health or cognition has been harmed by lead, the effects are
> permanent and continue into adulthood...Recent research has found that even very low
> levels of lead exposure can have a detrimental impact on a child's IQ, likelihood of
> having a learning disability, educational attainment, and reading readiness at
> kindergarten entry. Compared to adults, children are at greater risk... their rapidly
> growing minds and bodies are more susceptible to lead's harmful effects...Children of
> color and children living in poverty are disproportionately at risk. (**Compl. ¶ 22**)

The Supreme Court has long recognized a custodial grandparent's **14th Amendment -**

**Due Process Family Integrity Rights** to be one of the most fundamental liberty interests that

the Constitution protects. Suboh v. Dist. Attorney's Office of Suffolk Dist., 298 F.3d 81, 91 (1st

Cir. 2002) ("To begin, '[t]he interest of parents in the care, custody, and control of their children

is among the most venerable of the liberty interests embedded in the Constitution.'") (quoting

Hatch v. Dep't of Children, Youth & Their Families, 274 F.3d 12, 20 (1st Cir. 2001)); Lee v. City

of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001) ("It is well established that a parent has a

fundamental liberty interest in the companionship and society of his or her child. . . .") (quotation

marks omitted); J.B. v. Washington County, 127 F.3d 919, 925 (10th Cir. 1997) ("[T]he most

6

essential and basic aspect of familial privacy [is] the right of the family... [versus] ... the coercive interference of the awesome power of the [schools]").

It follows that the Plaintiff has a Constitutionally Protected Right (and a Sacred Duty) that compels him to do whatever he can, legally and non-violently, to prevent foreseeable, imminent and irreparable lead-poisoning harm directed at his Grandson (and other children) by malfeasant school officials who deceptively certify lead-poisoned Amherst school water as safe. While the plaintiff does not seek criminal prosecution of malfeasant school officials, their conduct is nonetheless criminal under **Massachusetts General Laws, Chapter 265, § 28**, whenever any school official "mingles poison with food, drink or medicine with intent to...willfully poison any...well or reservoir of water [used by schoolchildren] with such intent". In that Amherst first provided parents school lead-testing data in September, 2016, and Mr. Hootstein first documented his concerns in a letter to the School Committee on October 19, 2016, School Committee lead-poisoning conduct occurring now, in January, 2019, Defendant's malfeasant conduct appears to be shockingly deliberate and indifferent.

Amherst's Motion to dismiss mistakenly argues the Safe Drinking Water Act precludes the Plaintiff's filing of his Constitutional claims. This is a frivolous unsubstantiated claim, apparently designed to delay these proceedings and bully a concerned parent of a child with a learning disability into silence. **Amherst admits school drinking water is unfit for human consumption** when the Superintendent made a decision to purchase bottled water (not exceeding the FDA 5 ppb lead limit) for himself and his staff but not for the vulnerable schoolchildren in his care. (*See* **Exhibit B, "Central Office Water"**) Defendant School Committee cannot point to any language or statute in the Safe Drinking Water Act, or supporting MA DEP or U.S. EPA

7

regulatory involvement that supports school defendant's motion that the Safe Drinking Water Act precludes plaintiff's well-pled Section 1983 claims.

The Supreme Court's 2009 decision in Fitzgerald v. Barnstable School Committee, 555 U.S. 246, 252 (2009) explained the distinction between § 1983 claims premised on constitutional violations (alleged in the instant matter) and those based on statutory violations (like those enumerated by the SDWA) in determining whether a § 1983 claim is precluded. "In those cases in which the § 1983 claim is based on a statutory right, evidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Fitzgerald, at 252.

**Defendant School Committee cannot point to any statute creating any right allowing plaintiff to file suit under SDWA, alleging:** Defendant Amherst-Pelham Regional School Committee, acting under color of law, unilaterally violated and continues to violate, abrogate and impair, unreasonably and without justification, Plaintiff's, his Grandson's and other's due process liberty rights by arbitrarily, irrationally and knowingly providing toxic, lead-contaminated school drinking water unfit for human use and consumption to schoolchildren and adults (like the plaintiff) with knowledge that such lead-poisoning is likely to cause foreseeable and irreparable physical, emotional and financial harm to all. **(Compl. ¶ 32)**

**And, Defendant School Committee cannot point to any statute creating any right allowing plaintiff to file suit under SDWA, alleging:** Defendant School Committee maintains an arbitrary and irrational policy or custom of deliberate indifference in the protection of children, parents (like the plaintiff), teachers and school staff from serious and dire imminent

8

injury caused by lead toxicity. Defendant's unreasonable conduct has created, and continues to create danger and violate children's and adult's rights to bodily integrity.

**And, Defendant School Committee cannot point to any statute creating any right allowing plaintiff to file suit under SDWA, alleging:** As a result of defendant School Committee's policy or custom, school and town officials who orchestrated the Amherst School lead-poisoning cover-up knew that such misconduct toward children, or parents, was likely to go undetected and/or unpunished because there exists no administrative system of checks and balances within the public school system, and no federal or state law regulating lead in school drinking water. **(Compl. ¶ 34)**

**And, Defendant School Committee cannot point to any statute creating any right allowing plaintiff to file suit under SDWA, alleging:** In abrogation of defendant School Committee's duty to act in the best interest of children, defendant Amherst School Committee exposed, and continues to expose all their students and their parents (the plaintiff in the current matter) to toxic lead-contaminated school drinking water unfit for human use and consumption. **(Compl. ¶ 36)**

**And, Defendant Committee cannot point to any statute creating any right allowing plaintiff to file suit under SDWA, alleging:** As a result, plaintiff is deprived of his due process liberty rights in the care and protection (in the best interest) of his child; and he is injured and damaged in his property, personal health, physically, emotionally and economically by the inherently dangerous activity of the aforesaid defendant AR School Committee. **(Compl. ¶ 37)**

Based on U.S. Supreme Court case authority set out above, the Plaintiff avers that he does not "invoke § 1983 . . . as a vehicle to enforce the substantive federal law found in [the SDWA], but as a vehicle to recover for alleged violations" of the Due Process Clause -

9

allegations that he states would be actionable even if Congress had never enacted the SDWA. Communities for Equity, 459 F.3d at 684  Plaintiff argues that the fact that Congress "created a set of substantive statutory requirements, and adopted a set of procedures for enforcing those requirements, does not . . . suggest that Congress intend[ed] to foreclose a Section 1983 remedy for the violations of independent rights that find their source, not in laws passed by Congress, but in the Constitution itself."

The focus of the instant Court's inquiry on this question should be congressional intent. See Communities for Equity, 459 F.3d at 684 ("The question of what Congress intended . . . concerns not only which remedies Congress sought to provide for [statutory] violations, but whether Congress intended to abandon the rights and remedies set forth in [constitutional jurisprudence] when it enacted [the SDWA]."). "The burden . . . lies with the defendant in a § 1983 action to prove preclusion." Charvat, 246 F.3d at 615

Congress obviously didn't intend to abandon rights and remedies set forth in constitutional jurisprudence (by Plaintiff's *42 U.S.C. § 1983* Due Process claims) when it enacted SDWA because SDWA doesn't regulate lead in school drinking water.  SDWA statutes were intended to regulate public water supplies only, not school water supplies.

Therefore, Defendant School Committee has failed to prove preclusion in this case and the School Committee's Motion to Dismiss has no basis in law.

Mr. Hootstein does not allege that lead levels in the Amherst schools exceeded current "legal levels" in violation of the SDWA because **there aren't any "legal levels" under SDWA for lead in school drinking water**. Such duplicitous and deceptive child-endangering School Committee conduct, hiding behind non-existent imaginary state and federal SDWA statutes, goes

10

so far as to defy "settled law" established by the Supreme Court's precedent-setting decision in

Fitzgerald v. Barnstable School Committee, 555 U.S. 246, 252 (2009).

## B. PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE INJUNCTION IS WITHHELD

There are few harms more severe than one suffered by a parent like the Plaintiff who is

unable to protect his/her child from school-created harm. Harm is irreparable only if no adequate

legal remedy exists. Foxboro Co. v. Arabian Am. Oil Co., 805 F.2d 34, 36 (1st Cir. 1986) ("We

do not find irreparable injury where only money is at stake. . . ."); see also Ross-Simons of

Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996) (an injury is "irreparable" if it is

"not accurately measurable or adequately compensable by money damages).

Here, no money is at stake.  In a good faith attempt at narrowing the issues of this

controversy, the Plaintiff, Glen Ayers and Dr. Marc Edwards analyzed the lead data and

designed a cost effective remediation of lead in Amherst school drinking water - all at no cost to

Amherst Schools:

> **For a total cost of $8,000-10,000, 4-5 lead filtered hydration stations could be installed in each school**, where students could fill water bottles and obtain lead free water with complete confidence. This sort of simple investment would not only provide parents with peace of mind. Reducing our children's lead exposure would also pay important possible future dividends in the form of increased IQ scores, improved lifetime earning expectancy, and reduced rates of incarceration and other social ills. (*See* **Exhibit B, p. 2 ¶ 5)**

The plaintiff informed the defendant he would withdraw his complaint if Amherst would

agree to **install 4-5 lead filtered hydration stations in each of 5 open schools for a total cost**

**of approximately $10,000 X 5 = $50,000.**  In response, the school attorney, who stands to profit

the longer the schools litigate this matter, was gleeful and spiteful when he called the Plaintiff to

inform him his good faith offer was rejected in full.  The School Attorney conceals the fact that

safe FDA approved bottled water was secretly provided to the "Summit Academy" SE Campus

School throughout the 2017-2018 school year (before it was closed due the lead-poisoned water)

11

just like FDA approved bottled water was secretly provided to the "Central Office". (*See*

**Exhibit A, "Summit Academy [SE Campus School] Water")**

Mr. Hootstein will continue to suffer irreparable harm if the injunction is withheld.

Imagine, if you can, this grandfather's fear, emotional distress and sleep-deprived physical injury

caused by defendant's conscience-shocking lead-poisoning conduct. **A Massachusetts**

**Department of Public Health determination (June, 2016 Data Brief) augments his fears,**

**"There is no safe level of exposure to lead and even exposure to relatively low levels can**

**cause severe and irreversible health effects [and]... numerous studies have documented**

**correlations between childhood lead poisoning and future school performance,**

**unemployment, crime, violence and incarceration." (Compl. ¶ 21). May God have mercy**

**on our souls!**

Plaintiff contends there is a compelling state interest in the protection of Amherst

schoolchildren and the prevention of their systemic, wide-spread lead-poisoning in school

**(Compl. ¶ 13).** And, it is this compelling state interest which should compel this Honorable

Court to provide the requested relief so as not to render the Plaintiff Custodial Grandfather

powerless to protect his beloved Grandson.

Please consider the irreparable harm suffered by the Plaintiff as memorialized in his May

20, 2018 "settlement offer" letter **(Exhibit C)** to Defendant Amherst School Committee:

**I adopted Marc's guiding purpose as my own, that being to limit children's future lead
in water exposure to the greatest extent possible.**

I've been reaching out in good faith to this Committee for over 1 1/2 years now, and
respectfully, I find your deafening silent response extremely troubling!.. Except for one
"Water Update" slideshow presentation last year... this Committee has shut down any and
all public discourse, debate, deliberation or vote on any school policy addressing dangerous
high levels of lead in Amherst school drinking water.

12

**False and misleading legal advice is disseminated to the Committee, and false legal threats are made against individual Committee members - all for the corrupt purpose of usurping and obstructing the legal authority of the Committee, and preventing you from ever deliberating and voting on matters that call for the child-protective remediation of lead in school drinking water, or allege any Amherst School malfeasance, discrimination and/or civil rights violation.**

I respectfully ask the School Committee to fairly and impartially deliberate on, and vote to accept or deny, my following "settlement proposal" that calls for remediation of dangerous levels of lead in Amherst school drinking water, so we can amicably resolve my civil rights complaint (attached) in the most just, fair, child-protective and cost-effective manner possible.

My settlement proposal has been inspired by, and has the full support of, Marc Edwards, PhD., the foremost national expert on the matter before us. Marc did a cursory analysis of our Amherst lead-testing data, and agreed with me that testing shows lead levels in Amherst school drinking water was so "alarmingly" high that it constituted an imminent threat to our children's school safety.

Marc helped me design the best plan to limit lead in Amherst school drinking water to less than 1 part per billion (" 1 ppb ") of lead as recommended by the American Academy of Pediatrics and EPA to safeguard children from lead-poisoning. This plan calls for 4-5 individually plumbed MA DEP-approved lead-filtered hydration stations (with real-time warning systems to inform when filters need changing) to be installed in each lead-contaminated school, at an estimated cost of $2,000 per unit and approximately $8,000 - $10,000 per school.

**Please, our children are the true wealth of our nation - we can no longer turn a blind eye while we continue to poison them, and not suffer the cataclysmic consequences of our own consciousness-shocking deliberate indifference!**

## C. THE BALANCE OF HARMS WEIGH HEAVILY IN FAVOR OF EMERGENCY RELIEF HERE

The school lead-poisoning harm to the plaintiff, partially by and through his grandson,

grandson's classmates, 2,500 other Amherst schoolchildren, their parents and teachers, greatly

outweighs any threatened harm to the Amherst Regional School Committee.

The so-called 'balancing of the equities' requires a court to weigh "the hardship that will

befall the nonmovant if the injunction issues . . . with the hardship that will befall the movant if

the injunction does not issue." Mercado–Salinas v. Bart Enter. Intern., Ltd., 671 F.3d 12, 19 (1st

Cir. 2011) (citation omitted). Importantly, this factor should not be considered in isolation – "[i]n

13

considering this [balance of hardships] factor, it must be borne in mind that, where the likelihood of plaintiff's success is great, 'the less weight is to be given to the defendant's loss.'" TEC Engineering Corp. v. Budget Molders Supply, Inc., 927 F. Supp. 528, 535 (D. Mass. 1996), (quoting *FDIC v. Elio*, 39 F.3d 1239, 1248 (1st Cir. 1994)). In sum, the balance of the equities is not a measure of relative wealth or ability to sustain loss until a trial occurs but is an observation that juxtapose the parties' potential harms with their probabilities of success at trial.

Here, the balance of harms tips decidedly in favor of the issuance of injunctive relief. As shown above, Mr. Hootstein, by and through his grandson and all Amherst schoolchildren, will continue, since September, 2016, to suffer irreparable harm if Defendant's misconduct is not enjoined.

By contrast, the only "harm" that will come to defendant is the cost of safe FDA certified bottled water for Amherst's 2,500 schoolchildren, siblings, parents. teachers, staff and members of the public that utilize Amherst public school facilities, so Amherst children will have equal access to the same safe FDA approved bottled water purchased by Amherst for the Superintendent and his staff since 2017.

### D. ISSUING THE INJUNCTION IS IN THE PUBLIC INTEREST; WITHHOLDING THE INJUNCTION IS NOT IN THE PUBLIC INTEREST

The issuance of an emergency preliminary injunction against the Defendant Amherst-Pelham Regional School Committee would prevent foreseeable, imminent and irreparable lead-poisoning injury to Plaintiff's Grandson, the Plaintiff, more than 2,500 other Amherst schoolchildren and their parents. In that there is a compelling state interest in the protection of Amherst schoolchildren and the prevention of their systemic, wide-spread lead-poisoning in school (**Compl. ¶ 13**), **issuing this injunction is overwhelmingly in the Public Interest.**

14

Irrefutable scientific evidence proves Amherst school water is unfit for human consumption. In that Amherst school water poses an unacceptable foreseeable, imminent and irreparable lead-poisoning risk to Amherst schoolchildren, **the issuance of the requested emergency preliminary injunction is in THE PUBLIC INTEREST.**

The Plaintiff respectfully asks the Court to **ORDER** Defendant Amherst Regional School Committee to provide all Amherst students and their parents equal access to the same safe FDA certified bottled water the Committee provides the Superintendent and his Central Office staff, and previously provided equally for all at the "Summit Academy" Southeast Campus School before it was closed down due to lead-contaminated school drinking water!

## IV. CONCLUSION

For the foregoing reasons, Mr. Hootstein requests entry of the requested emergency preliminary injunction.

Respectfully submitted on January 4, 2019,

Michael B. Hootstein, Pro Se
PO Box 158
Shutesbury, MA 01072

15

## CERTIFICATE OF SERVICE

I hereby certify that the Pro Se Plaintiff in this case is not a registered CM/ECF user. Therefore, I have mailed the foregoing document by First-Class Mail, postage prepaid, on January 4, 2019, to Defendant Amherst-Pelham Regional School Committee, by and through their Attorney, David McCay, Mirick, O'Connell, DeMallie & Lougee, LLP, 1800 West Park Drive, Suite 400, Westborough, MA 01581-3926.

Michael B. Hootstein, Pro Se

16