UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MICHAEL HOOTSTEIN, | |
| Plaintiff, | |
| v. | Civil Action No. 17-30146-MGM |
| AMHERST-PELHAM REGIONAL SCHOOL COMMITTEE, | |
| Defendant. | |

MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS
(Dkt. No. 12)

February 11, 2019

MASTROIANNI, U.S.D.J.

Plaintiff Michael Hootstein is a custodial grandparent of a student at Amherst Regional High School ("ARHS") and of a young child who will attend Amherst schools. Plaintiff is proceeding *pro se* and brought claims against Defendant Amherst-Pelham Regional School Committee ("Defendant") related to lead-contaminated water at Defendant's schools, including ARHS. The complaint alleges two causes of action: first, a claim under 42 U.S.C. § 1983 that Defendant's response to lead-contaminated drinking water violated Plaintiff's, his grandson's, and others' Fourteenth Amendment due process rights (Count I); and second, the same conduct violated Article 97 of the Amendments to the Massachusetts Constitution (Count II). Plaintiff seeks various forms of injunctive and declaratory relief, but he does not seek monetary damages. Defendant moved to dismiss both counts, arguing the § 1983 claim is preempted by the Safe Drinking Water Act ("SDWA"), Defendant is not subject to the SDWA, and Art. 97 does not confer a private right of

action. The court heard argument on the motion on January 17, 2019.[1] As explained below, Defendant's motion to dismiss will be granted in part and denied in part.

## I. BACKGROUND

As the custodian of his two grandsons (one a student at ARHS who has a learning disability, the other a 5-year-old who will attend Amherst schools), Plaintiff is concerned about lead contamination in the water at Amherst schools.[2] (Compl. (Dkt. No. 1) at ¶¶ 1, 12.) "'There is no safe level of exposure to lead and even exposure to relatively low levels can cause severe irreversible health effects.'" (*Id.* at ¶ 21 (quoting June 2016 report from Massachusetts Department of Public Health).) Legislation pending in Massachusetts when Plaintiff filed his complaint, if passed, would have required immediate shut-off of school drinking or cooking water containing more than 1 part per billion ("ppb") of lead. (*Id.* at ¶ 1.)

Water at Amherst schools is lead-contaminated, and, Plaintiff alleges, five Amherst schools have 90th percentile lead levels between 35 ppb and 93 ppb, which is between 1.4 and 3.7 times more contaminated than the water in Flint, Michigan.[3] (*Id.* at ¶¶ 15-19.) A local newspaper reported

---

[1] On January 7, 2019, Plaintiff filed a motion for an emergency preliminary injunction. (Dkt. No. 24.) At the hearing on January 17, the court heard argument on whether there was an emergency and found the nature of the motion did not require an immediate ruling. Consequently, Plaintiff's motion for a preliminary injunction, which seeks relief Plaintiff also requested in his complaint, remains pending.

[2] According to the complaint, the National Institutes of Health have concluded that lead is "'a systemic toxicant affecting virtually every organ system'" and "'children are at a greater risk than adults of suffering from the neurotoxic effects of lead.'" (Compl. (Dkt. No. 1) at ¶ 20.) The National Center for Healthy Housing has similarly concluded that "'[o]nce a child's health or cognition has been harmed by lead, the effects are permanent and continue into adulthood . . . [E]ven very low levels of lead exposure can have a detrimental impact on a child's IQ, likelihood of having a learning disability, educational attainment, and reading readiness at kindergarten entry.'" (*Id.* at ¶ 22.) As the Massachusetts Department of Public Health has reported, "'studies have documented correlations between childhood lead poisoning and future school performance, unemployment, crime, violence and incarceration.'" (*Id.* at ¶ 21.)

[3] A 90th percentile lead level means 90% of samples tested are lower than that level and 10% are higher. (Compl. (Dkt. No. 1) at ¶ 14.) The 90th percentile lead level can trigger the EPA's lead contamination treatment requirements. *See* 40 C.F.R. § 141.80(c). The 90th percentile lead level at ARHS, where Plaintiff's grandson attends, is allegedly 40 ppb, which, according to Plaintiff, is 1.6 times more contaminated than Flint's water. (Compl. (Dkt. No. 1) at ¶ 18.)

"many" water samples that remained in pipes overnight "exceeded the EPA's 15 parts per billion action level for lead," but "almost all" of the samples "had negative tests for lead when water ran for 30 seconds." (*Id.* at ¶ 28.) The article quoted the Amherst Health Director as saying, "'[T]he water consumed at schools is likely to be just a minor portion of any lead intake.'" (*Id.*) Subsequent news coverage claimed that, of schools tested in western Massachusetts, "the Amherst-Pelham Regional School District had the highest number of taps with elevated levels of lead." (*Id.* at ¶ 29.) The same Health Director was quoted as saying, "'It's not that there's lead in the water, the water that enters the schools is safe. What happens is as it goes through these fixtures; [sic] it's picking up some lead.'" (*Id.*) Thus, the town itself acknowledged water became contaminated when passing through fixtures in schools.

On October 11, 2016, the Acting Superintendent informed parents that school drinking water was safe "after using the flushing protocols." (*Id.* at ¶ 23.) Plaintiff subsequently sent four written complaints to Defendant that the flushing protocols were ineffective, lead contamination in school drinking water had not been reduced to safe levels, and Amherst schools had been providing children contaminated drinking water and food prepared using contaminated water. (*Id.* at ¶¶ 23-26.) He contended that "increased rates of Amherst children with learning disabilities in our schools suggest the possibility that lead ingested by our children at school caused or contributed to our children's learning disabilities." (*Id.* at ¶ 25.)

Plaintiff acknowledges Defendant took corrective action to remediate lead in school drinking water but claims that after remediation, Defendant failed to test the water to ensure it was safe to drink. (*Id.* at ¶ 27.) He also alleges Defendant falsely claimed water was safe to drink when it was not, which exposed people to lead-contaminated water and possible lead poisoning. (*Id.* at ¶¶ 4, 30) He requested Defendant provide Amherst schools with bottled water (*id.* at ¶ 25), which Defendant has allegedly not done.

Plaintiff alleges Defendant created a "foreseeable risk" that he, his grandson, and others would be "lead-poisoned at an Amherst public school from drinking lead-contaminated water deceptively certified as safe by defendant." (*Id.* at ¶ 4.) Defendant's alleged misconduct began in September 2016 when it learned that Plaintiff and others "were likely drinking/ingesting lead-contaminated school drinking water/food" and chose not to warn them. (*Id.* at ¶ 5.) Defendant allegedly "provid[ed] toxic, lead-contaminated school drinking water unfit for human use and consumption to schoolchildren and adults (like the plaintiff)" knowing "lead-poisoning is likely to cause foreseeable irreparable physical, emotional and financial harm." (*Id.* at ¶ 32; *see also id.* at ¶ 36 (Defendant "continues to expose all their [sic] students and their parents (the plaintiff in the current matter) to toxic lead-contaminated school drinking water").)  In addition, Defendant "has continued to deny irrefutable scientific evidence proving Amherst school drinking water dangerously exposes students (like plaintiff's grandson), parents (like the plaintiff), teachers and school staff to dire injury and imminent impairment known to be caused by even low levels of lead toxicity that bioaccumulates over time and is mostly stored in human bone." (*Id.* at ¶ 6.)

In Count I, Plaintiff claims Defendant deprived him of his rights to bodily integrity and to care and protect his grandson; Plaintiff also claims that, under the state-created danger doctrine, Defendant exposed him and others to possible lead poisoning. (*Id.* at ¶¶ 4, 7, 30, 33, 37, 39.) Plaintiff further claims he has been denied his procedural due process right to seek redress for Defendant's conduct. (*Id.* at ¶ 35.) In Count II, Plaintiff claims Defendant violated his right "to clean water" under Art. 97 of the Amendments to the Massachusetts Constitution. (*Id.* at ¶¶ 38-39.) He alleges he has suffered and will suffer emotional, economic, and physical injuries, but the complaint does not seek monetary damages. (*Id.* at ¶¶ 3-7, 32-33, 36-37, 39.) Rather, he seeks declaratory and injunctive relief, including an order requiring Defendant to provide bottled water to schools, install lead-free water supply lines in contaminated schools, conduct periodic lead testing, and perform an

independent assessment of the extent of students' and others' lead exposure. (*Id.* at Prayer for Relief.) Plaintiff also requests the appointment of a monitor to ensure Defendant complies with lead standards in proposed legislation pending in Massachusetts in 2017. (*Id.*)

## II.     CLAIMS BROUGHT ON BEHALF OF A MINOR OR OTHER PERSON

Plaintiff listed himself as the only plaintiff in the caption on the complaint. But throughout the complaint, his various motion papers, and at oral argument, he stated he is bringing this action to protect the rights of himself, his grandson, all other students and parents, teachers, staff, and the general public. (Compl. (Dkt. No. 1) at ¶¶ 3-6, 32-34, 36, 39; MTD Opp. (Dkt. No. 14) at 1-3, 13-15; Motion for PI (Dkt. No. 24) at 1; PI Brief (Dkt. No. 25) at 1-2, 7-14.) Defendant did not raise the issue of standing in its motion to dismiss, but, in its opposition to Plaintiff's motion for a preliminary injunction, Defendant argued Plaintiff lacks standing to assert claims on his grandson's behalf.

"By law, there are 'only' two ways an individual may appear in federal court, either '*pro se* or through legal counsel.'" *Clauson v. Town of W. Springfield*, No. Civ. A. 99-30134-MAP, 2000 WL 251740, at *2 (D. Mass. Feb. 3, 2000) (quoting *Herrera-Venegas v. Sanchez-Rivera*, 681 F.2d 41, 42 (1st Cir. 1982)); *see also* 28 U.S.C. § 1654 ("the parties may plead and conduct their own cases personally or by counsel"). Accordingly, a *pro se* party cannot represent people other than him or herself. *See Crippa v. Johnston*, No. 91-1676, 1992 WL 245716, at *1 (1st Cir. Oct. 1, 1992) (per curiam) ("We have interpreted [28 U.S.C. § 1654] as barring a non-lawyer from representing anyone else but himself or herself."). The First Circuit has explained the rule's purpose:

> [A] party may be bound, or its rights waived, by its legal representative. When that representative is a licensed attorney there are grounds for belief that the representative's character, knowledge and training are equal to the responsibility. In addition, remedies and sanctions are available against the lawyer that are not available against [a lay representative], including misconduct sanctions and malpractice suits.

*Herrera-Venegas*, 681 F.2d at 42 (assessing rule prohibiting lay representation in context of non-lawyer prisoner seeking to represent follow inmates).

The rule even bars a non-lawyer parent from representing his or her child. *See Crippa*, 1992 WL 245716, at *1 ("[A]lthough appellant and her children were represented by counsel below, appellant is appearing *pro se* on appeal. As a result, she may not represent her children in this appeal.") (citing 28 U.S.C. § 1654); *Ethan H. v. State of N.H.*, No. 92-1098, 1992 WL 167299, at *1 (1st Cir. July 21, 1992) (*pro se* parents may not represent their children before district court or on appeal); *accord Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990) ("a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child"); *Osei-Afriyie v. Med. Coll. of Penn.*, 937 F.2d 876, 882-83 (3d Cir. 1991) (parent "was not entitled, as a non-lawyer, to represent his children in place of an attorney in federal court"); *Meeker v. Kercher*, 782 F.2d 153, 154 (10th Cir. 1986) ("We hold that under Fed. R. Civ. P. 17(c) and 28 U.S.C.A. § 1654, a minor child cannot bring suit through a parent acting as next friend if the parent is not represented by an attorney."). The Second Circuit explained the rationale for applying the rule to parents:

> The choice to appear *pro se* is not a true choice for minors who under state law, *see* Fed. R. Civ. P. 17(b), cannot determine their own legal actions. There is thus no individual choice to proceed *pro se* for courts to respect, and the sole policy at stake concerns the exclusion of non-licensed persons to appear as attorneys on behalf of others.
>
> It goes without saying that it is not in the interests of minors or incompetents that they be represented by non-attorneys. Where they have claims that require adjudication, they are entitled to trained legal assistance so their rights may be fully protected.

*Cheung*, 906 F.2d at 61.

The court appreciates these concerns about a lay person adequately representing a minor's legal interests. But the potential unfairness of the rule is evident to the court because it prevents minors—who cannot bring their own *pro se* actions—from vindicating their rights in federal court unless they are represented by counsel. As a result, children are denied access to our legal system if

their guardians are not attorneys, cannot afford counsel, or cannot find an attorney willing to take a case on contingency. *See* Sonja Kerr, Winkelman*: Pro Se Parents of Children with Disabilities in the Courts (or Not?)*, 26 Alaska L. Rev. 271, 285 (2009) ("As a policy matter, without the right to represent their children in regard to substantive rights, parents may not have the ability or resources to protect those rights. As a result, the children's underlying claims may be permanently lost.").

The court recognizes Plaintiff's good intentions in wanting to protect his grandson and is sensitive to Plaintiff's interest in upholding his grandson's rights. Nevertheless, the court is bound by the rule prohibiting a lay guardian from representing a minor. As a result, Plaintiff—as a *pro se* litigant—can assert claims only on his own behalf. He cannot bring claims on behalf of his grandson or anyone else. This means the court cannot consider any claim that Plaintiff's grandson or anyone else suffered or will suffer harm because of Defendant's conduct. If Plaintiff would like to bring an action on behalf of his grandson or a class action on behalf of a class of people similarly situated to Plaintiff or his grandson, he must first arrange for counsel to represent him.

Thus, the court will consider only Plaintiff's claims brought on his own behalf.

### III.       LOCAL RULE 7.1

Defendant's motion does not contain a certification pursuant to Local Rule 7.1(a)(2) that, before filing the motion, counsel conferred with Plaintiff and "attempted in good faith to resolve or narrow the issue[s]." On the morning of the hearing on the motion to dismiss, Plaintiff filed a summary of his legal arguments, in which he contended the motion to dismiss should be denied because Defendant did not confer with him before filing it. (Dkt. No. 33 at 1.)

"Local Rule 7.1 plays an important role in the practices and procedures of this District." *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, --- F.R.D. ---, 2018 WL 6169366, at *2 (D. Mass. Nov. 26, 2018). It is "not an empty exercise"; instead, it "fosters discussion between parties about matters before they come before the court, and it preserves scarce

judicial resources." *Martinez* v. *Hubbard*, 172 F. Supp. 3d 378, 385 (D. Mass. 2016). Monetary sanctions are available for failing to comply with the rule. *See id.* Dismissal is also available but is not always appropriate. *See Sun Capital*, 2018 WL 6169366, at *2 (citing *Gerakaris v. Champagne*, 913 F. Supp. 646, 651 (D. Mass. 1996) ("[W]hile a litigant's failure to observe the Local Rules invites sanctions, omitting to confer prior to filing a motion certain to be opposed does not warrant so severe a sanction as summary denial.")).

Here, it is unlikely a pre-motion conference would have changed the parties' positions or narrowed the issues. The parties fundamentally disagree about whether Plaintiff's § 1983 is preempted by federal statute. Under these circumstances, it would be inappropriate to impose the sanction of summary denial for failing to comply with Local Rule 7.1 (a)(2).

Local Rule 7.1 serves an important function, and the court is concerned "that Local Rule 7.1 certification has been subject to considerable backsliding since its adoption." *Sun Capital*, 2018 WL 6169366, at *2. Both parties must comply with the rule going forward.

## IV.     MOTION TO DISMISS STANDARD

A complaint must contain "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), that "possess[es] enough heft to show that the pleader is entitled to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks omitted). To survive a Rule 12(b)(6) challenge, the allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). In considering a motion to dismiss for failure to state a

claim, the court accepts all well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *See McCloskey v. Mueller*, 446 F.3d 262, 266 (1st Cir. 2006). "[A] *pro se* plaintiff is entitled to liberal construction of his allegations, no matter how inartfully pled." *Youngworth v. Gentile*, No. 05-30108-MAP, 2007 WL 1827207, at *2 (D. Mass. June 22, 2007) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). And the court holds *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers." *Haines*, 404 U.S. at 520.

## V.     ANALYSIS

### A.     Section 1983 Claim

#### 1.     Preemption by the Safe Drinking Water Act

In Count I, Plaintiff brought a claim under 42 U.S.C. § 1983 that Defendant's response to lead-contaminated drinking water violated his Fourteenth Amendment due process rights. Defendant contends that, based on the First Circuit's holding in *Mattoon v. City of Pittsfield*, 908 F.2d 1 (1st Cir. 1992), the SDWA preempts the § 1983 claim. Plaintiff points out there is a circuit split on the issue and asks this court to follow *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1281 (2018), 138 S. Ct. 1285 (2018), 138 S. Ct. 1294 (2018), rather than First Circuit precedent. In *Boler*, which involves two consolidated cases about water contamination in Flint, Michigan, the Sixth Circuit rejected the First Circuit's analysis in *Mattoon* and held that the SDWA does not preempt § 1983 claims. Beyond the First and Sixth Circuits, no other court of appeals appears to have weighed in on the issue. While this court is bound by applicable First Circuit precedent, the Sixth Circuit's analysis of *Mattoon* convincingly distinguished it from the Flint cases, which are similar in some respects to the present case. Therefore, this court finds it appropriate to analyze *Mattoon*, *Boler*, and post-*Mattoon* Supreme Court precedent bearing on the issue of preemption.

###### i.    Preemption of § 1983 Claims Generally

Section 1983 establishes a mechanism for plaintiffs to seek redress for constitutional

violations. It provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . .

42 U.S.C. § 1983. Through a line of cases beginning with *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea*

*Clammers Ass'n*, 453 U.S. 1 (1981) [hereinafter *Sea Clammers*] and ending most recently with *Fitzgerald*

*v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009), the Supreme Court has held that § 1983 may be

preempted by statutes providing comprehensive remedial enforcement schemes. *See Boler*, 865 F.3d

at 401-03 (summarizing cases); *see also Sea Clammers*, 453 U.S. at 20 ("When the remedial devices

provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate

congressional intent to preclude the remedy of suits under § 1983."). If Congress intended for a

statutory remedial scheme to "'be the exclusive avenue through which a plaintiff may assert [its]

claims,'" then "the § 1983 claims are precluded." *Fitzgerald*, 555 U.S. at 252 (quoting *Smith v. Robinson*,

468 U.S. 992, 1009 (1984)).

The key, then, is congressional intent. In assessing congressional intent, the Supreme Court

distinguishes § 1983 claims based constitutional violations from those based on statutory violations:

> In those cases in which the § 1983 claim is based on a statutory right,
> evidence of such congressional intent may be found directly in the
> statute creating the right, or inferred from the statute's creation of a
> comprehensive enforcement scheme that is incompatible with
> individual enforcement under § 1983. In cases in which the § 1983
> claim alleges a constitutional violation, lack of congressional intent may
> be inferred from a comparison of the rights and protections of the
> statute and those existing under the Constitution. Where the contours
> of such rights and protections diverge in significant ways, it is not likely

> that Congress intended to displace § 1983 suits enforcing
> constitutional rights.

*Fitzgerald*, 555 U.S. at 252-53 (internal quotation marks and citations omitted). Courts "should 'not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for a'" constitutional claim. *Id.* at 256 (quoting *Smith*, 468 U.S. at 1012).

ii.        **Sixth Circuit's Preemption Analysis in *Boler v. Earley***

The plaintiffs in *Boler* brought § 1983 claims against state actors; the plaintiffs also brought other claims but did not bring any claim alleging the defendants violated the SDWA. *See Boler*, 865 F.3d at 399-400. The District Court determined the SDWA preempted the § 1983 claims and dismissed them. *See id.* at 396. The Sixth Circuit reversed. *See id.*

When the Sixth Circuit analyzed the SDWA, it had the benefit of the Supreme Court's reasoning in *Fitzgerald* distinguishing between § 1983 claims premised on constitutional violations from those premised on statutory violations. The Sixth Circuit began its analysis by examining the SDWA's text and legislative history for an indication of whether Congress intended for the SDWA to foreclose § 1983 claims. *See id.* at 403-05. The court did not find clues in the text or legislative history about Congress's intent (or lack thereof) to displace § 1983 claims, *id.* at 404-05, so it next evaluated the structure of the statute and the comprehensiveness of its remedial scheme compared to the relevant constitutional rights and protections, *id.* at 405-06. The SDWA authorizes the EPA to compel compliance with clean water standards, 42 U.S.C. § 300g-3(b), and impose civil penalties for non-compliance, *id.* at § 300g-3(g)(3). Further, the SDWA allows for judicial review of EPA actions. *Id.* at § 300j-7. Beyond giving the EPA authority to enforce the statute, the SDWA gives enforcement rights to private persons. First, "any person may intervene as a matter of right" in government enforcement actions. *Id.* at § 300j-8(b)(1)(B). Second, there is a citizen-suit provision creating a private right of action against alleged SDWA violators. *Id.* at § 300j-8(a). There are certain procedural requirements for filing a citizen-suit, including giving notice to the potential defendant,

the EPA, and the state where the violation occurred. *Id.* at § 300j-8(b)(1)(A). The statute does not

provide for an award of monetary damages. *See Waid v. Busch*, 740 F. App'x 94, 95 (6th Cir. 2018)

(per curiam). But it permits recovery of litigation costs, including reasonable attorney and expert

witness fees. *See* 42 U.S.C. § 300j-8(d).

The SDWA also contains a savings clause regarding the availability of other relief: "Nothing

in this section shall restrict any right which any person (or class of persons) may have under any

statute or common law to seek enforcement of any requirement prescribed by or under this

subchapter or to seek any other relief." 42 U.S.C. § 300j-8(e). This language is similar to savings

clauses in the statutes at issue (Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* and

Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. § 1401, *et seq.*) in *Middlesex County*

*Sewerage Authority v. National Sea Clammers Association.* In *Sea Clammers*, the Supreme Court assessed

the statutes' savings clauses but only with respect to whether the plaintiffs could bring claims to

enforce those statutes outside of the statutes' citizen-suit provisions. *See* 453 U.S. at 15-16. As the

Sixth Circuit explained, the Supreme Court's determination about the scope of the savings clauses in

*Sea Clammers* "was premised on violations of the statute[s] [themselves]," *Boler*, 865 F.3d at 405, and

did not address whether the savings clauses permitted § 1983 claims based on constitutional

violations. Based on the SDWA's language, including the savings clause, the *Boler* court found its

remedial schemes "are not so comprehensive as to demonstrate congressional intent to preclude

remedies under § 1983 for constitutional violations." *Id.* at 406; *see also id.* at 405 ("The language of

the SDWA's savings clause lends support to a conclusion that Congress contemplated leaving open

§ 1983 as an avenue for relief for claims arising under the Constitution.").

Finally, the Sixth Circuit compared "'the contours of the rights and protections' provided by

the SDWA and those existing under the Constitution [to determine whether they] 'diverge in

significant ways.'" *Id.* at 406 (quoting *Fitzgerald*, 555 U.S. at 252). Significant divergence "lends

further support to the conclusion that Congress did not intend [the statute] to preclude § 1983 constitutional suits." *Fitzgerald*, 555 U.S. at 256. As to the § 1983 claim, the Sixth Circuit reviewed what a plaintiff must prove to establish a substantive due process violation, focusing on the state's culpability for the contaminated water, which varies depending on circumstances like whether there was time "for reflection and unhurried judgments" (in which case the standard is deliberate indifference) or if there was no opportunity for "reasoned deliberation" (in which case the standard might be higher). *Boler*, 865 F.3d at 408 (internal quotation marks omitted). The level of culpability is important because

> [a] violation of the SDWA that does not meet a deliberate indifference standard, such as a state actor's negligent action resulting in contaminant levels above the established maximum, plainly would not meet the requirements of a due process violation. Likewise, a state actor's deliberately indifferent action concerning contaminants in public water systems, which created a special danger to a plaintiff that the state knew or should have known about, could violate the Due Process Clause without also violating the SDWA, if the hypothetical contaminants did not exceed the statutory maximums or were not regulated by it.

*Id.* at 408. As a result, "[t]he contours of the rights and protections of the SDWA and those arising under the Constitution, and a plaintiff's ability to show violations of each, are 'not . . . wholly congruent.' This further supports the conclusion that Congress did not intend to foreclose § 1983 suits by enacting the SDWA." *Id.* at 408-09 (quoting *Fitzgerald*, 555 U.S. at 258).

### iii.    First Circuit's Preemption Analysis in *Mattoon v. City of Pittsfield*

The plaintiffs in *Mattoon* brought claims under the citizen-suit provisions of the SDWA related to drinking water contaminated with the giardia lamblia pathogen due to a malfunctioning chlorination system. *See Mattoon*, 980 F.2d at 2-3. The plaintiffs also brought a § 1983 damages claim based on two allegations: first, that the plaintiffs' rights under SDWA had been violated, and second, that their "'constitutional right' to safe drinking water" had been violated. *Id.* at 5. At the summary judgment stage, the district court concluded the SDWA preempted the § 1983 claims. *Id.* at 3-4.

The First Circuit followed *Sea Clammers* in assessing whether "Congress intended to preserve a right of action under section 1983 **to redress SDWA violations**." *Id.* at 5 (emphasis added). The court reviewed the SDWA's enforcement scheme, including the provisions allowing the EPA or individuals states to bring lawsuits against alleged SDWA violators and the citizen-suit provisions. *Id.* at 5-6. The court briefly addressed the SDWA's savings clause[4] in a footnote: "Nor does the SDWA savings clause, *see* 42 U.S.C. § 300j-8, avail appellants here. The Court has held that the almost identically worded FWPCA savings clause, *see* 33 U.S.C. § 1365(a), bars relief under 42 U.S.C. § 1983." *Id.* at 6 n.6 (citing *Sea Clammers,* 453 U.S. at 14-16). In sum, the First Circuit held that because "the SDWA enforcement scheme is closely analogous to other enforcement schemes found sufficiently comprehensive to evince a clear congressional intent to preempt relief under section 1983, . . . [the] section 1983 claims are preempted by the SDWA." *Id.* at 6.

*Mattoon* was decided before *Fitzgerald*—in which the Supreme Court set up a framework for analyzing preemption of § 1983 claims based on constitutional versus statutory violations—and the First Circuit's analysis of the plaintiffs' § 1983 claim premised on a purported constitutional violation is limited. The court began by hinting that a constitutional right to safe drinking water does not exist[5] but continued its analysis assuming it did. *Id.* at 6. After making that assumption, the court began and ended its analysis with the following: "Comprehensive federal statutory schemes, such as the SDWA, preclude rights of action under section 1983 for alleged deprivations of constitutional

---

[4] The version of the SDWA in effect at the time of *Mattoon* contained the same savings clause the current version does. *See* 42 U.S.C. § 300j-8(e) (effective from Nov. 16, 1977 until Aug. 5, 1996) ("Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any requirement prescribed by or under this subchapter or to seek any other relief.").

[5] The Sixth Circuit similarly noted there likely is no constitutional right to safe drinking water. *See Boler*, 865 F.3d at 408 n.4 ("The Defendants also argue that the Plaintiffs' claims rest on a constitutional right to safe drinking water, which no courts have found to be a fundamental right. But the Plaintiffs explicitly deny that they seek to enforce such a right, or that their claims must rest on such a right."). Here too Plaintiff has not asserted a constitutional right to clean drinking water but instead alleged his due process rights have been violated. (Compl. (Dkt. No. 1) at ¶¶ 3-4, 7, 30, 32-33, 35, 37.)

rights in the field occupied by the federal statutory scheme." *Id.* (citing cases in which courts found Education of the Handicapped Act, Civil Rights Act as amended by Equal Employment Opportunity Act, and Age Discrimination in Employment Act all provided exclusive remedies even where plaintiffs asserted constitutional violations).

The Sixth Circuit reviewed *Mattoon* and distinguished it for two reasons. First, the *Mattoon* § 1983 claim was based on violations of the SDWA and infringement of a purported constitutional right to safe drinking water. *Boler*, 865 F.3d at 405. The *Boler* plaintiffs, like Plaintiff here, did not premise their § 1983 claim on any statutory violation or a right to safe drinking water and instead based it on various constitutional provisions, including the Due Process Clause. *See id.* at 405-06. Second, and "[m]ore importantly, the First Circuit's conclusion predated *Fitzgerald*, where the Supreme Court explained that when reviewing cases in which the § 1983 claim alleges a constitutional violation, the appropriate framework is to seek to infer congressional intent from the text and legislative history of the statute, review the nature and extent of the remedial scheme, and compare the rights and protections of the statute with those found in the Constitution." *Id.* at 406.

### iv.     Application to the Present Case

This court is persuaded by the Sixth Circuit's reasoning in *Boler* and concludes this case is sufficiently distinguishable from *Mattoon* such that a different outcome is warranted here. Plaintiff's § 1983 claim is based entirely on an alleged violation of his due process rights. He does not claim Defendant violated the SDWA, a point he reiterated in his motion to dismiss opposition.[6] (Plaintiff's

---

[6] At oral argument, Plaintiff contended this case has nothing to do with the SDWA because the statute applies to public water systems. *See* 42 U.S.C. § 300g. Plaintiff argued the public water system is responsible for water in mains but is not responsible for water once it enters the pipes that carry water from the mains into buildings. Building owners and homeowners become responsible at that point and remain responsible for contamination that occurs due to lead in a building's fixtures. Plaintiff alleges the contamination comes from the schools' fixtures, which, according to Plaintiff, makes Defendant responsible and not the public water system. As a result, Plaintiff argued, the SDWA does not apply to his claims. Because Plaintiff gave substance to this line of analysis for the first time at oral argument, it has not been fully developed, and the court does not reach any conclusion as to its merits. *See also infra* n.7.

Opp. Br. (Dkt. No. 14) at 6, 13-14.) *Mattoon*, in contrast, involved a § 1983 claim based on violations

of the SDWA and an unrecognized constitutional right to clean water. As explained in *Boler*, the

rights and protections afforded by the Fourteenth Amendment and the SDWA do not perfectly

overlap, meaning conduct that might violate the Constitution does not necessarily violate the SDWA

and vice versa. *See* 865 F.3d at 408; *cf. Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 615 (6th

Cir. 2001) ("The crucial point, however, is that Charvat's § 1983 suit raises the issue of whether the

defendants violated his constitutional right to free speech, not simply whether Charvat suffered

from an adverse employment action [when he was fired for reporting defendants' alleged violations

of the Clean Water and Safe Drinking Water Acts]."). Plaintiff's § 1983 claim to enforce his due

process rights is different in kind from a claim to safe drinking water or a claim under the SDWA.

*See Rietcheck ex rel. Rietcheck v. City of Arlington*, No. 04-CV-1239-BR, 2006 WL 37843, at *3 (D. Ore.

Jan. 4, 2006) ("Plaintiffs here, on the other hand, bring their First Claim under § 1983 to enforce

their constitutional rights to be free from state-created danger, which is an entirely different kind of

claim and is only tangentially related to safe drinking water. The Court, therefore, concludes

Plaintiffs' First Claim brought under § 1983 is not preempted by the SDWA because Plaintiffs do

not seek to vindicate any right addressed by the SDWA.").

As previously noted, *Mattoon* was decided without the benefit of *Fitzgerald*. As described

above, the Sixth Circuit in *Boler* assessed congressional intent using the *Fitzgerald* framework by

analyzing the SDWA's text and legislative history, reviewing its remedial scheme, and comparing the

SDWA's rights and protections to those found in the Constitution. *See Boler*, 865 F.3d at 403-09. The

*Boler* court's comprehensive analysis, particularly its comparison of the rights and protections

afforded by the SDWA and the Fourteenth Amendment, is compelling. It leads this court to the

same conclusion that the SDWA does not preempt Plaintiff's § 1983 claim, which is based on

alleged violations of constitutional rights that provide protections greater than or different from the SDWA's protections.

As for *Mattoon*'s discussion of the SDWA's savings clause, the First Circuit relied on *Sea Clammers*. The context of the *Sea Clammers* analysis is important. As explained above, the *Sea Clammers* Court reviewed the savings clauses only in the context of whether the plaintiffs could bring claims—outside of the statutes' citizen-suit provisions—to redress violations of those statutes. *See Sea Clammers*, 453 U.S. at 15-16; *see also Boler*, 865 F.3d at 405 (Supreme Court's determination about savings clauses in *Sea Clammers* "was premised on violations of the statute[s] [themselves]," not on constitutional violations). The context in *Mattoon* is similar to that in *Sea Clammers*: the *Mattoon* plaintiff's § 1983 claim was based on (1) an alleged violation of the SDWA, and (2) an alleged violation of an unrecognized "'constitutional right' to safe drinking water." In comparison, the context here is similar to that in *Boler*: Plaintiff's § 1983 claim is based solely on alleged violations of his due process rights. As a result, this case is distinguishable from *Mattoon*.

Thus, the court concludes that the SDWA does not preempt Plaintiff's § 1983 claim.[7]

## 2. Plaintiff Sufficiently Alleged a Claim for a Due Process Violation.

Section 1983 provides the mechanism through which plaintiffs can seek redress for violations of federal constitutional rights. Here, Plaintiff's § 1983 claim alleges Defendant violated his Fourteenth Amendment due process rights under the state-created danger doctrine and by

---

[7] Defendant asserts the SDWA preempts § 1983, and Defendant is not subject to the SDWA because Defendant is not a public water supply. On the second point, Plaintiff and Defendant appear to agree. Because the court finds the SDWA does not preempt § 1983 and Plaintiff has not alleged Defendant violated the SDWA, the court need not reach the issue of whether Defendant is subject to that statute. *See also supra* n.6.

violating his rights to bodily integrity and to care for and protect his grandson. Plaintiff also raised a procedural due process claim.[8]

Defendant misconstrues Plaintiff's federal constitutional claim by inferring he raised a Fourteenth Amendment claim separate from his § 1983 claim. Defendant contends Plaintiff seeks redress for a Fourteenth Amendment right to clean water, which does not exist. And, even if it did exist, Defendant argues the SDWA precludes that claim. In its reply brief, Defendant argues for the first time that the complaint fails to allege sufficient facts to support a substantive due process claim, but only with respect to the "state-created danger doctrine" and only in a perfunctory manner.

The court will briefly address the proper legal framework for Plaintiff's state-created danger and bodily integrity substantive due process theories and consider whether he has standing to assert a due process claim. *See Pollard v. Law Office of Mandy L. Spaulding*, 766 F.3d 98, 101 (1st Cir. 2014)

---

[8] In their motion papers, the parties did not address Plaintiff's claim regarding his right to care for and protect his grandson or his procedural due process claim. At the hearing, Defendant briefly noted that, what it referred to as a "family integrity claim," should not survive a Rule 12(b)(6) analysis.

Both theories are under-developed, and neither is sufficiently pled. The allegations as to both are limited to the following:

- As his grandson's custodian, Plaintiff has been "deprived of his rights in the care and protection (in the best interest) of his child." (Compl. (Dkt. No. 1) at ¶ 7.)

- "[P]laintiff is deprived of his due process liberty rights in the care and protection (in the best interest) of his child." (*Id.* at ¶ 37.)

- "[P]laintiff has been summarily deprived of any due process to seek redress for defendant's deliberately indifferent, arbitrary and irrational deprivation of safe, clean potable drinking water in violation of plaintiff's procedural due process rights." (*Id.* ¶ 35.)

The court appreciates Plaintiff's *pro se* status and that well-pleaded facts and reasonable inferences must be read in his favor, but bare assertions like these are not enough to survive dismissal. As a result, Plaintiff's claims about alleged violations of his purported right to care for and protect his grandson and of his procedural due process rights are dismissed without prejudice. Plaintiff may file a motion for leave to amend the complaint to add factual allegations supporting these claims. If Plaintiff files a motion for leave to amend the complaint, he must submit the proposed amended complaint with that motion. Defendant will have an opportunity to oppose the motion for leave to amend. The court will assess Plaintiff's proposed amendments, including whether they are futile, meaning the court will consider whether the proposed amendments contain legally and factually sufficient allegations to state a plausible claim for relief. *See Iqbal*, 556 U.S. at 678-79.

("[W]hether a plaintiff has Article III standing implicates a federal court's subject-matter jurisdiction and, thus, must be resolved no matter how tardily the question is raised.").

### i.     Substantive Due Process Analysis

The Fourteenth Amendment's Due Process Clause provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The right to substantive due process is narrow. *See Ramos-Piñero v. Puerto Rico*, 453 F.3d 48, 52 (1st Cir. 2006). Courts are "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). "[T]he Due Process Clause does not guarantee minimum levels of safety or security" and "is not a substitute for traditional tort remedies." *Ramos-Piñero*, 453 F.3d at 52.

### a.     State-Created Danger

Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dept' of Soc. Servs.*, 489 U.S. 189, 197 (1989). The "state-created danger theory," an exception to this general rule, is recognized by at least eight circuits. *Irish v. Me.*, 849 F.3d 521, 526 (1st Cir. 2017). That theory is based on language in *DeShaney* suggesting, but not expressly recognizing, "the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise." *Rivera v. R.I.*, 402 F.3d 27, 34-35 (1st Cir. 2005) (citing *DeShaney*, 489 U.S. at 201). The First Circuit "has discussed the possible existence of the state-created danger theory, [but has] never found it applicable to any specific set of facts." *Irish*, 849 F.3d at 526 (reversing dismissal of due process claim and remanding for development of facts related to state-created danger).

To make out a colorable claim under the state-created danger doctrine, the state must "play a role in the creation or enhancement of . . . danger," and "the state actions must shock the

conscience of the court." *Rivera*, 402 F.3d at 35. The First Circuit has cautioned that, "in a state

creation of risk situation, where the ultimate harm is caused by a third party, courts must be careful

to distinguish between conventional torts and constitutional violations, as well as between state

inaction and action." *Id.* at 36 (internal quotation marks and citation omitted).

Regardless of whether the First Circuit even explicitly recognizes this "state-created danger

theory," the theory clearly does not apply under these facts. Here, as alleged in the complaint,

Defendant directly caused the harm by falsely claiming, after high levels of lead were discovered in

school drinking water, that the water was nevertheless safe to drink. However, the state-created

danger theory, as mentioned, is an exception to the general rule that "a State's failure to protect an

individual against" harm caused by "private actors" does not constitute a due process violation.

*DeShaney*, 489 U.S. at 195, 197. Accordingly, the state-created danger theory applies only when the

underlying premise—harm caused in some way by private actors—is present. The Supreme Court's

decision in *DeShaney* itself recognizes this distinction between harms caused by "the State itself" and

those caused by third parties. *See id.* at 195-96 (explaining that the Due Process Clause "forbids the

State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its

language cannot fairly be extended to impose an affirmative obligation on the State to ensure that

those interests do not come to harm through other means. . . . Its purpose was to protect the people

from the State, not to ensure that the State protected them from each other."); *Guertin v. State*, 912

F.3d 907, 917 (6th Cir. 2019) ("Although the Clause provides no guarantee 'of certain minimal levels

of safety and security,' it expressly prohibits deprivations by 'the State itself.'" (quoting *DeShaney*, 489

U.S. at 195)); *Guertin*, 912 F.3d at 925 n.6 ("*DeShaney* itself makes clear in the same token that injuries

*caused* by the state are of a different ilk" than injuries arising from a state's failure to protect from

third-party harm) (emphasis in original); *see also Rivera*, 402 F.3d at 34 (to establish a substantive due

process claim, "the plaintiff must show that the deprivation of this protected right was caused by

government conduct. That is easily met when a government actor causes the injury . . . . It is much more difficult when the person who inflicts the injury is a private person.") (internal citation omitted).

Therefore, to the extent Plaintiff seeks to invoke the state-created danger exception,[9] his allegations present a mismatch with this theory.[10] Rather, Plaintiff's allegations are more properly analyzed as a direct substantive due process claim for violation of his right to bodily integrity. The court discusses that claim next.

b.     **Bodily Integrity**

Bodily integrity claims are based on the common law "right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891); *see also Ingraham v. Wright*, 430 U.S. 651, 673 (1977) ("Among the historic liberties so protected [by the Due Process Clause] was a right to be free from and to obtain judicial relief . . . for unjustified intrusions on personal security."). Indeed, "[n]o right is held more sacred." *Union Pac. Ry. Co.*, 141 U.S. at 251.

As the Sixth Circuit recently explained, in the context of the "Flint Water Crisis," "the central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in

---

[9] In addition to the state-created danger doctrine, several circuits also recognize another exception to the general rule that the state does not have an affirmative duty to protect that applies if there is a "special relationship" between the state and the victim. As the Second Circuit has explained, "'special relationship' liability arises from the relationship between the state and a particular victim, whereas 'state created danger' liability arises from the relationship between the state and the private assailant." *Pena v. DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005). Plaintiff here has not raised a claim under the "special relationship" doctrine.

[10] As to the state-created danger doctrine, in its reply brief, Defendant argued only that the "gravamen" of the complaint is not a constitutional violation but a policy argument that federal and state regulatory schemes are not sufficiently protective. (Reply Brief (Dkt. No. 17) at 7.) While the complaint does allege due process violations, the court agrees with Defendant that it cannot be required to comply with pending legislation regarding lead contamination levels.

which the government intrudes upon an individual's body." *Guertin*, 912 F.3d at 919. For example, "[i]nvoluntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding the nature of the interference—is a classic example of invading the core of the bodily integrity protection." *Id.* at 920-21; *see also Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 313 (D. Mass. 1999) (explaining that "the failure to disclose the alleged true nature of the experiments . . . vitiates any 'consent' that may have been given, thereby rendering the experiments similar to the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional"). The Sixth Circuit held that these earlier government experiment cases were analogous to the Flint Water Crisis. *Guertin*, 912 F.3d at 920-21. "In both instances," the Sixth Circuit explained, "individuals engaged in voluntary actions that they believed would sustain life, and instead received substances detrimental to their health," and "[i]n both instances, government officials engaged in conduct designed to deceive the scope of the bodily invasion." *Id.* at 921.

In addition to demonstrating a deprivation of a constitutionally protected interest—in this case, a liberty interest in bodily integrity—a plaintiff asserting a substantive due process claim also must ultimately show that the defendant's "'acts were so egregious as to shock the conscience.'" *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (quoting *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006)); *see also Rivera*, 402 F.3d at 36 ("The state actions must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'") (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). Whether conduct is conscience-shocking is fact-specific. *Rivera*, 402 F.3d at 36. "In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may" be sufficiently shocking. *Id.* Moreover, "whether behavior is conscience-shocking may be informed in some cases by the nature of the right violated." *Martinez v. Cui*, 608 F.3d 54, 66 (1st Cir. 2010). In the bodily integrity context,

the Supreme Court has balanced the deprivation of the plaintiff's liberty interest "against the government's undeniable competing interests." *Id.*; *see also Heinrich*, 62 F. Supp. 2d at 313.

Here, for present purposes, Plaintiff plausibly stated a substantive due process bodily integrity claim. He alleged Defendant not only provides lead-contaminated water to students and parents—knowing the extreme danger this entails—but that it falsely certifies this water is safe to drink. These allegations, which the court must accept as true at this stage of the litigation, are similar to those described by the Sixth Circuit in *Guertin* regarding the Flint Water Crisis. *See Guertin*, 912 F.3d at 925-26 ("[V]arious defendants' assurances of the water's potability hid the risks, turning residents' voluntary consumption of a substance vital to subsistence into an involuntary and unknowing act of self-contamination," which "is no different than the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional.") (internal quotation marks omitted). In addition, similar to *Guertin*, Defendant allegedly had extensive time to deliberate, plausibly suggesting conscience-shocking deliberate indifference. *See id.*

Moreover, with regard to standing, Plaintiff alleges he has been directly harmed through his exposure to the lead-contaminated water. (*See* Compl. (Dkt. No. 1) ¶¶ 3-7, 32-33, 36.) Reading these allegations in the most favorable light, the court infers that because Plaintiff is the custodian of a student attending ARHS, he had reason to be in the school and drank contaminated water while there. Granted, Plaintiff has not included a direct allegation that he drank lead-contaminated water or when he did so. Nevertheless, given Plaintiff's *pro se* status and that Defendant has not actually argued for dismissal on this basis, the court will not dismiss the claim on the ground that the complaint's allegations regarding personal harm are lacking. Rather, this issue and other potential theories of harm may be confronted during discovery and developed by the parties as appropriate.

**B.** **Article 97 of the Amendments to the Massachusetts Constitution**

In Count II, Plaintiff alleged Defendant violated Art. 97 of the Amendments to the

Massachusetts Constitution, which provides that "[t]he people shall have the right to clean air and

water, . . . and the protection of the people in their right to the conservation, development and

utilization of agricultural, mineral, forest, water, air and other natural resources is hereby declared to

be a public purpose."[11] Defendant argues Art. 97 does not confer a private right of action. Plaintiff

did not respond to Defendant's argument about his Art. 97 claim.

Defendants cite two cases for the proposition there is no private right of action to enforce

the right to clean water: *Enos v. Sec'y of Envtl. Affairs*, 432 Mass. 132 (2000) and *Chase v. Trust for Pub.*

*Land*, No. 329075 (KCL), 2008 WL 642635 (Mass. Land Ct. Mar. 11, 2008). Neither clearly answers

the question. *Enos* involved plans to construct a sewage treatment plant. *See* 432 Mass. at 133.

Property owners sought declaratory judgment invalidating a certification that an environmental

impact report about the plant complied with the Massachusetts Environmental Protection Act. *See*

*id.* The Massachusetts Supreme Judicial Court ("SJC") held that the property owners did not have

standing under the Act. *See id.* at 138. The only reference to the right to clean air and water is in a

footnote: "We also reject the plaintiffs' claim that their constitutional right to clean air and clean

water, as provided in art. 49 of the Amendments to the Massachusetts Constitution, entitles them to

---

[11] The rest of Art. 97 provides:

> The general court shall have the power to enact legislation necessary or
> expedient to protect such rights.

> In the furtherance of the foregoing powers, the general court shall have the
> power to provide for the taking, upon payment of just compensation
> therefor, or for the acquisition by purchase or otherwise, of lands and
> easements or such other interests therein as may be deemed necessary to
> accomplish these purposes.

> Lands and easements taken or acquired for such purposes shall not be used
> for other purposes or otherwise disposed of except by laws enacted by a two
> thirds vote, taken by yeas and nays, of each branch of the general court.

standing to challenge the Secretary's decision."[12] *Id.* at 142 n.7. The court did not give further explanation.

*Chase* does not involve the clean air and water provisions of Art. 97 and focuses instead on its provisions allowing takings and easements for conversation purposes. There, property owners alleged certain real estate transactions—all of which had been approved by the state's Department of Conservation and Recreation ("DCR")—violated Art. 97's conservation restrictions. *See* 2008 WL 642635, at *1, *5. Relying on *Enos*, the Land Court dismissed the claims, finding "[t]here is no private right of action under Article 97," *id.* at *1, and a private citizen may not invoke Art. 97 "to obtain judicial review of the DCR approval," *id.* at *5.

While there is at least one case in which private citizens enforced Art. 97's takings and easements provisions, that case does not support finding a private right of action to enforce the right to clean water. In *Smith v. City of Westfield*, 478 Mass. 49 (2017), residents sued to halt construction of a school on land that was a public playground. The residents sought a writ of mandamus for a court order requiring the city to comply with Art. 97 by receiving legislative approval to convert the playground. The SJC held that land dedicated by municipalities as public parks is protected by Art. 97, meaning it "cannot be sold or devoted to another public use without plain and explicit legislative authority." *Id.* at 62. Because the playground had been so dedicated and the legislature had not authorized its conversion into a school, the SJC remanded the case for the trial court to issue a permanent injunction halting the school's construction. *Id.* at 64. *Smith* demonstrates that, at least in some contexts, private citizens may enforce Art. 97's conservation protections. But *Smith* does not relate to Art. 97's general reference to the right to clean water and

---

[12] The current Art. 97 replaced Art. 49 of the Amendments to the Massachusetts Constitution and contains the same provisions. *See Mahajan v. Dep't of Envtl. Protection*, 464 Mass. 604, 605 n.3 (2013) ("Article 97 of the Amendments to the Massachusetts Constitution, approved and ratified on November 7, 1972, superseded art. 49 of the Amendments, but preserved the right of the people to enjoy the natural resources of the Commonwealth.").

does not stand for the proposition that there is a private right of action to enforce that right. Instead, *Smith* is about the exclusive power of the legislature to repurpose lands designated as being protected by Art. 97.

Because Plaintiff did not respond to Defendant's Art. 97 arguments, he has not provided any cases supporting the proposition that he can sue to enforce the right to clean water. The court's own research has not located any such case, and, furthermore, "[t]he SJC has never held that there is a right of action to enforce the [Massachusetts] Declaration of Rights." *Pimentel v. City of Methuen*, 323 F. Supp. 3d 255, 273 (D. Mass. 2018).[13] Federal courts should avoid "extend[ing] Massachusetts law beyond what is supported by existing authority." *RFF Family P'Ship, LP v. Ross*, 814 F.3d 520, 535 (1st Cir. 2016); *see also Braga v. Genlyte Grp.*, 420 F.3d 35, 42 (1st Cir. 2005) ("A federal court sitting in diversity must take care not to extend state law beyond its well-marked boundaries in an area . . . that is quintessentially the province of state courts.") (internal quotation marks and citation omitted); *Pimentel*, 323 F. Supp. 3d at 274 ("[I]t is emphatically not the role of the federal courts to develop and expand upon state law. If this Court were to conclude that such a right existed [under the Massachusetts Declaration of Rights], no Massachusetts court would have an opportunity to consider that decision—including, among other things, an opportunity to consider the wisdom of the policy embedded in such a decision and the potential consequences for litigants and the courts. It is up to the courts of Massachusetts, not this Court, to make that choice.").

Accordingly, the court will not read a private right of action into Art. 97. Count II is therefore dismissed with prejudice.

---

[13] *Pimentel* identified two cases from the 1980s in which the SJC noted in dicta that a private right of action "may" be generally available to redress violations of state constitutional rights. *Pimentel*, 323 F. Supp. 3d at 273 (citing *Phillips v. Youth Dev. Program, Inc.*, 390 Mass. 652, 657-58 (1983) ("a person whose constitutional rights have been interfered with may be entitled to judicial relief even in the absence of a statute providing a procedural vehicle for obtaining relief"); *Layne v. Superintendent, Mass. Corr. Inst., Cedar Junction*, 406 Mass. 156, 159-60 (1989) ("a State may not violate a person's constitutional rights and then fairly assert that no redress can be had because the State has not provided a statutory means of enforcing those rights")).

# VI.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (Dkt. No. 12) is GRANTED IN PART and DENIED IN PART as follows:

- As to Count I:

  o    Plaintiff may pursue his § 1983 claim based on a bodily integrity theory. Plaintiff may litigate that claim based **only** on **his** alleged exposure to lead-contaminated water in Amherst schools.

  o    Plaintiff's claims based on a purported right to care for and protect his grandson and a procedural due process violation are both dismissed without prejudice. As described in footnote 8, he may move for leave to amend his complaint to allege facts supporting either or both of those theories.

  o    Plaintiff may not pursue his § 1983 claim based on a state-created danger theory, and that theory is dismissed with prejudice.

- Count II is dismissed with prejudice.

A separate order will issue scheduling an evidentiary hearing on Plaintiff's motion for a preliminary injunction.

It is So Ordered.

/s/ Mark G. Mastroianni
MARK G. MASTROIANNI
UNITED STATES DISTRICT JUDGE